Stacey Eugene JOHNSON *v.* STATE of Arkansas

CR 05-1180                                    235 S.W.3d 872

Supreme Court of Arkansas
Opinion delivered May 18, 2006

*Jeff Rosenzweig*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

JIM GUNTER, Justice. The issue in this case is whether the circuit court complied with this court's mandate in *Johnson v. State*, 356 Ark. 534, 157 S.W.3d 151 (2004). We hold that it did comply and affirm the circuit court's order.

Appellant Stacey Eugene Johnson was convicted of capital murder in the death of Carol Heath and was sentenced to death in 1994. We reversed the conviction because the trial court admitted a statement from the victim's daughter identifying Johnson, after the daughter had been found incompetent to testify at trial. *Johnson v. State*, 326 Ark. 430, 934 S.W.2d 179 (1996), *cert. denied*, 520 U.S. 1242 (1997) (*Johnson I*). In a second trial, Johnson was again convicted of capital murder and sentenced to death. We affirmed the conviction and sentence. *See Johnson v. State*, 342 Ark. 186, 27 S.W.3d 405 (2000), *cert. denied*, 532 U.S. 944 (2001) (*Johnson II*).

Johnson then filed two petitions in the circuit court for postconviction relief: a Rule 37 petition, claiming ineffective assistance of counsel, and an Act 1780 petition for writ of *habeas corpus*, seeking to retest certain DNA evidence.[1] The circuit court denied both petitions. On appeal, we affirmed the denial of relief on the Rule 37 petition, but reversed and remanded on one of Johnson's claims in his Act 1780 petition. *Johnson v. State*, 356 Ark. 534, 157 S.W.3d 151 (2004) (*Johnson III*). Specifically, we agreed with Johnson that certain negroid hairs introduced into evidence should be retested. *Id.* at 564, 157 S.W.3d at 173. Relying on DNA test results indicating that the probability that the hairs

---

[1] The version of Act 1780 of 2001 that is relevant to this appeal is codified at Ark. Code Ann. § 16-112-201 through § 16-112-207 (Supp. 2003).

belonged to another African American was only 1 in 250, we held that because this ratio included so many persons other than Johnson, he was entitled to retest these hairs. *Id.* at 550, 157 S.W.3d at 163.

On remand, the circuit court did not order retesting of the negroid hairs, but instead entered an order finding that the State had complied with our requirement that the hairs be retested because the hairs had been retested in preparation for the second trial in 1997. Under the new test, the DNA profile matched that of Johnson and decreased the likelihood from 1 in 250 to 1 in 720 million that the hairs belonged to an African American other than Johnson. The circuit court denied Johnson's Act 1780 new-trial request. Johnson appeals from that order.

Johnson's sole point on appeal is that the trial court erred in denying him the right to have the negroid hairs retested upon remand from *Johnson III*. Specifically, he argues that our mandate required the circuit court to retest the hairs and that the circuit court had no discretion to deny retesting. We affirm.

A brief factual history regarding the evidence at issue in *Johnson III* is helpful to explain the issue in this appeal. In *Johnson III*, Johnson argued, among other things, that the circuit court erred in denying his Act 1780 petition seeking retesting of DNA evidence from saliva found on a cigarette butt and from certain negroid hairs. We denied his claim with regard to the cigarette butt, but agreed with Johnson that the negroid hairs should be retested. We remanded to the trial court to order retesting.

We described this evidence and the tests performed on it as follows:

> DNA test evidence was presented at both trials on the cigarette butt and negroid hairs, and Johnson was not able to be excluded as the donor of the DNA. According to Kermit Channell of the Arkansas Crime Laboratory, the chances the DNA belonged to another African American were 1 in 250.

> Sometime after the first trial, further testing was performed on the saliva on the cigarette butt and it was shown that Johnson still was not excluded as the donor and the probability that another African American was the donor of the DNA was decreased from 1 in 250 to 1 in 28 million. In other words, retesting actually made it more likely that it was Johnson's DNA on the cigarette butt. *The negroid hairs were not retested.*

*Id.* at 543, 157 S.W.3d at 159 (emphasis added).

In denying Johnson's request for a retest of the cigarette butt, we reasoned that the cigarette butt had already been retested once, and that, "[f]ar from excluding Mr. Johnson, the probability of the saliva being a donor other than Mr. Johnson went from 1 in 250 to 1 in 28 million, thereby decreasing the probability that the saliva belonged to anyone other than Mr. Johnson." *Id.* at 549, 157 S.W.3d at 162-63. We agreed with the trial court that Johnson was seeking an endless succession of retesting of old evidence, stating that

> Act 1780 was not meant to do away with finality in judgments. It was meant to be used to test evidence that will prove *actual innocence* of a wrongly-convicted person. It is conceivable that one could test and retest evidence repeatedly, each time obtaining a more narrow result, while there is still a "theoretical possibility" that at some point a retest would exclude a defendant. Where would it end?

*Id.* (emphasis in original).

In granting Johnson's request to retest the negroid hairs, we stated as follows:

> The test results on the negroid hairs presented at trial are much more troubling. At trial, DNA results on these hairs could not exclude Mr. Johnson, but the probability that they belonged to another African-American were only 1 in 250. Considering the population of African-Americans in Arkansas alone, these results could conceivably include hundreds or thousands of people besides Mr. Johnson. Mr. Johnson acknowledges that retesting could result in the same narrowing of probability that happened when the cigarette butt was retested, but that the 1 in 250 ratio is so broad and includes so many persons other than Mr. Johnson, that he is entitled to retesting of the negroid hairs under Act 1780. We agree that retesting of the negroid hairs could be materially relevant to Mr. Johnson's claim of innocence ....
>
> For these reasons, we reverse the trial court's denial of Mr. Johnson's Act 1780 petition for retesting of the negroid hairs and remand for the trial court to have such tests conducted.

*Id.* at 550-51, 157 S.W.3d at 163-64.

The State contends, and the circuit court found, that our opinion in *Johnson III* contained a factual error. We stated in *Johnson III* that the DNA test results indicated that the probability

the DNA from the negroid hairs belonged to another African American besides Johnson was 1 in 250; we also stated that the negroid hairs had not been retested after this finding. *See Johnson III, supra.* After examination of the record, we believe that this statement was incorrect.

The 1 in 250 probability resulted from a test conducted in February 1994 before the first trial. The negroid hairs were tested three more times after the first trial. Melisa Weber, a DNA analyst with Cellmark Diagnostics who performed all of the DNA tests, testified in the second trial that five tests were performed on the negroid hairs. While the second test conducted in 1994 resulted in a ratio of 1:250, the final test, described in a June 18, 1997, report, stated that the statistical frequency distribution of the genetic material — that is, the negroid hairs — belonging to someone other than the appellant came to 1:720 million in the African-American population. The court regrets its factual error, but it does not affect our holding in *Johnson III*.

The issue before this court is whether the circuit court complied with the mandate. A "mandate" is

> the official notice of action of the appellate court, directed to the court below, advising that court of the action taken by the appellate court, and directing the lower court to have the appellate court's judgment duly recognized, obeyed, and executed.

*City of Dover v. Barton*, 342 Ark. 521, 525, 29 S.W.3d 698, 700 (2000) (quoting *Dolphin v. Wilson*, 335 Ark. 113, 983 S.W.2d 113 (1998)).

In *Dolphin*, we adopted the Third Circuit Court of Appeals' rules regarding mandates, stating that "[t]his fundamental rule binds every court to honor rulings in the case by superior courts. . . . [A]n inferior court has no power or authority to deviate from the mandate issued by an appellate court. . . . A trial court must implement both the letter and spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." *Dolphin*, 335 Ark. at 118, 983 S.W.2d at 114 (quoting *Casey v. Planned Parenthood*, 14 F.3d 848, 857 (3d Cir. 1994)).

> Where a remand limits the issues for determination, the court on remand is precluded from considering other issues, or new matters, affecting the cause. . . . Similarly, when a case is remanded for a specific act, the entire case is not reopened, but rather the lower tribunal is only authorized to carry out the appellate court's man-

> date, and the trial court may be powerless to undertake any proceedings beyond those specified.
>
> Any proceedings on remand which are contrary to the directions contained in the mandate from the appellate court may be considered null and void.

*City of Dover*, 342 Ark. at 526, 29 S.W.3d at 700 (internal citations omitted).

Our mandate in *Johnson III* states as follows:

> This case was submitted to the Arkansas Supreme Court on the record of the Circuit Court of Sevier County and briefs of the respective parties. After due consideration, it is the decision of the Court that the case be affirmed in part; reversed and remanded in part for the reasons set out in the attached opinion. Special Justice Barbara Webb joins. Corbin, J., not participating.

This mandate remands "for the reasons set out in the attached opinion." Our law requires the trial court to implement both the letter and spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces. *See Dolphin, supra.* The court may not reopen the case to consider other issues or matters not included in the mandate. *See City of Dover, supra.*

■ In this case, the circuit court complied with the mandate. It did not reopen the case or consider any issues other than a retest of the negroid hairs. Our decision in *Johnson III* was concerned with whether a retest was required under Act 1780, not whether it had been conducted. While we did order retesting of the negroid hairs in *Johnson III*, we did so because we were troubled by the ratio of 1:250. We stated that the "1 in 250 ratio is so broad and includes so many persons other than Mr. Johnson that he is entitled to retesting[.]" *Id.* at 550, 157 S.W.3d at 163. What we made clear in *Johnson III* is that the point of error in this case is the point at which the DNA test indicated a probability ratio of 1 in 250. The trial court correctly found that the negroid hairs were retested after this point of error. In fact, they were retested three times. The final DNA test of the negroid hairs indicated a statistical frequency distribution that the genetic material belonged to someone in the African-American population other than the appellant was 1 in 720 million. We hold that the circuit court complied with the letter and spirit of our mandate in *Johnson III*. Another retest is not necessary.

Affirmed.

IMBER, J., dissents.

CORBIN, J., not participating.

ANNABELLE CLINTON IMBER, Justice, dissenting. A "man-date" is the official notice of action of the appellate court, directed to the court below, advising that court of the action taken by the appellate court, and directing the lower court to have the appellate court's judgment duly recognized, obeyed, and executed. *Dolphin v. Wilson*, 335 Ark. 113, 983 S.W.2d 113 (1998) (citing 5 Am. Jur. 2d § 776). "[A]n inferior court has no power or authority to deviate from the mandate issued by an appellate court." *Briggs v. Penn. R. Co.*, 334 U.S. 304, 306 (1948). Moreover, the matters decided upon one appeal become the law of the case and govern this court upon a second appeal, even though we might be inclined to say that we were wrong in the first instance. *Wilson v. Rodgers*, 256 Ark. 276, 507 S.W.2d 508 (1974).

In *Johnson v. State*, 356 Ark. 535, 57 S.W.3d 151 (2004) (*Johnson III*), our court concluded that the DNA results on the negroid hairs could not exclude Mr. Johnson and that the prob-ability of another African-American being the donor of the DNA in question was 1 in 250.[1] With regard to DNA results on the negroid hairs, we issued the following mandate and order to the circuit court:

> *The negroid hairs.* The test results on the negroid hairs presented at trial are much more troubling. At trial, DNA results on these hairs could not exclude Mr. Johnson, but the probability that they belonged to another African-American were only 1 in 250. Con-sidering the population of African-Americans in Arkansas alone, these results could conceivably include hundreds or thousands of people besides Mr. Johnson. Mr. Johnson acknowledges that retest-ing could result in the same narrowing of probability that happened

---

[1] Our opinion in the direct appeal, *Johnson v. State*, 342 Ark. 186, 192, 27 S.W.3d 405, 409 (2000) (*Johnson II*), reflects the same conclusion. Not until the petition for rehearing in *Johnson III* did the State challenge the accuracy of that conclusion. Moreover, the State now concedes that its statements in the earlier petition for rehearing "incorrectly characterized negroid hairs submitted to Cellmark by the state crime lab." The State's valiant attempt to clarify which hairs were tested and retested, as well as the findings from those tests, only serves to confirm that the record itself is difficult to decipher.

when the cigarette butt was retested, but that the 1 in 250 ratio is so broad and includes so many persons other than Mr. Johnson, that he is entitled to retesting of the negroid hairs under Act 1780. We agree that retesting of the negroid hairs could be materially relevant to Mr. Johnson's claim of innocence. Certainly, the other evidence in this trial shows that a favorable result would not *per se* exonerate Mr. Johnson. Nonetheless, our interpretation of § 16-112-202 does not require such a showing of complete exoneration in order to request retesting alone. The fact that some of the negroid hairs were found on the victim's body made them particularly relevant to the prosecution's case, and test results that would exclude Mr. Johnson could significantly advance his claim of innocence. For these reasons, *we reverse the trial court's denial of Mr. Johnson's Act 1780 petition for retesting of the negroid hairs and remand for the trial court to have such tests conducted.*

*Johnson III,* 356 Ark. at 550-51, 157 S.W.3d at 163-64 (emphasis added).

On remand, the circuit court did not order retesting of the negroid hairs; rather, the court went behind this court's mandate and determined that the State had previously retested the hairs. In fact, the circuit court simply concluded that our holding was erroneous. Whether or not this court erred in *Johnson III,* the circuit court was obligated to comply with our mandate to have the negroid hairs retested. Moreover, our court does not now have the authority to determine that we were previously wrong in ordering the circuit court to retest the negroid hairs. *Wilson v. Rodgers, supra.* The only relevant inquiry is whether the circuit court complied with our previous mandate — and it clearly did not.

Consequently, it is beyond me how the majority is able to conclude that an action that so blatantly flies against the court's holding in *Johnson III* complies with the "letter and spirit of our mandate." The majority opinion is nothing more than a disguised recall of our mandate in *Johnson III* for the purpose of declaring error. In effect, the majority goes behind the opinion in *Johnson III* to declare that *Johnson III* contains a factual error. The majority then suggests that the factual error does not affect our holding in *Johnson III.* Yet, in *Johnson III* we reversed the trial court's denial of Mr. Johnson's petition for retesting of the negroid hairs <u>and</u> remanded for the trial court to have such tests conducted. As of

today, however, the trial court's order denying Mr. Johnson's petition for retesting is affirmed.

For the above-stated reasons, I respectfully dissent.