Stacey Eugene JOHNSON *v.* STATE of Arkansas

CR 02-1362                                    157 S.W.3d 151

Supreme Court of Arkansas
Opinion delivered April 1, 2004

[Rehearing denied May 13, 2004.]

536

*Jeff Rosenzweig*; and *Dorcy K. Corbin*, Arkansas Public Defender Comm'n, for appellant.

*Mike Beebe*, Att'y Gen., by: *Jeffrey A. Weber*, Ass't Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. Appellant Stacey Eugene Johnson was convicted of capital murder in the death of Carol Heath and was sentenced to death in 1994. See *Johnson v. State*, 326 Ark. 430, 934 S.W.2d 179 (1996), *cert. denied*, 520 U.S. 1242 (1997) (*Johnson I*). We reversed that conviction because the trial court admitted a statement from the victim's daughter identifying Mr. Johnson, after the daughter had been found incompetent to testify at trial. *Id*. A change of venue was granted for the retrial, in which the daughter was found competent to testify and did so, identifying Mr. Johnson. He was convicted and again sentenced to death, and we affirmed the conviction and sentence. See *Johnson v. State*, 342 Ark. 186, 27 S.W.3d 405 (2000), *cert. denied*, 532 U.S. 944 (2001) (*Johnson II*). A complete recitation of the facts and circumstances surrounding the murder of Carol Heath and the evidence presented at Mr. Johnson's trial is not necessary here, but may be found in *Johnson II*.

This is an appeal from a hearing that concerned two petitions filed by Mr. Johnson. The first was a Rule 37 petition claiming ineffective assistance of counsel, and the second was an Act 1780 petition for writ of *habeas corpus* filed in December 2001, which sought new testing and retesting of DNA evidence. In August 2002, the circuit court denied both the Rule 37 and the Act 1780 petitions in separate orders. Two days before the circuit court's ruling, Mr. Johnson moved to supplement his petition with a claim that victim-impact evidence and his resulting death sentence violated the rule of law handed down by the U.S. Supreme Court in *Ring v. Arizona*, 536 U.S. 584 (2002). The trial court denied the motion to supplement.

Mr. Johnson appeals on four points. First, Mr. Johnson contends the circuit court erred in denying his Act 1780 petition for further DNA testing of evidence. Second, Mr. Johnson asserts numerous points of error regarding the circuit court's denial of his Rule 37 petition. Next, Mr. Johnson argues error in the denial of the motion to supplement his petition after the U.S. Supreme Court handed down *Ring v. Arizona, supra*. Finally, Mr. Johnson reargues that his death sentence was in violation of the federal and state constitutional prohibitions against *ex post facto* laws.

We agree with Mr. Johnson that his Act 1780 petition should have been granted for retesting of some DNA evidence; therefore, we reverse and remand for that DNA retesting to be performed. We affirm on all other points.

Arkansas Rule of Criminal Procedure 37.3 gives our court jurisdiction over this appeal of a denial of Rule 37 postconviction relief; also, as this is a case involving a sentence of death, we have jurisdiction pursuant to Ark. Sup. Ct. R. 1-2(a)(2).

■ In appeals of postconviction proceedings, we will not reverse a trial court's decision granting or denying postconviction relief unless it is clearly erroneous. *Dansby v. State*, 350 Ark. 60, 84 S.W.3d 857 (2002). A finding is clearly erroneous when, although there is evidence to support it, the appellate court after reviewing the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Id.*; *Davis v. State*, 345 Ark. 161, 44 S.W.3d 726 (2001).[1]

■ As to Rule 37 claims of ineffective assistance of counsel, the general standard of review is found in *Strickland v. Washington*, 466 U.S. 668 (1984). The *Strickland* two-pronged test first requires the defendant to show that counsel's performance was deficient to the extent that "counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment." *Id.* at 687. There is a strong presumption that counsel's conduct falls within reasonable professional assistance. *Id.* at 689. Counsel is allowed great leeway in making strategic and tactical decisions and those decisions are a matter of professional judgment. *Noel v. State*, 342 Ark. 35, 26 S.W.3d 123 (2000). Matters of trial tactics and strategy are not grounds for postconviction relief on the basis of ineffective assistance of counsel. *Lee v. State*, 343 Ark. 702, 38 S.W.3d 334 (2001). The second prong of *Strickland* requires a showing of prejudice such that counsel's deficient performance deprived the defendant of a fair trial. *Id.* at 687. This court has described this prejudice as meaning that the defendant must show there is a reasonable probability that, but for counsel's errors, the outcome of the trial — either in the guilt or the penalty phases — would have been different. *See State v. Hardin*, 347 Ark. 62, 60 S.W.3d 397 (2001); *Lasiter v. State*, 290 Ark. 96, 717 S.W.2d 198 (1986).

---

[1] Without giving us any reason why we should do so, Mr. Johnson invites this court to overrule our case law and adopt a *de novo* standard of review when the appeal of postconviction proceedings concerns questions of law or mixed questions of law and fact. We decline Mr. Johnson's invitation to do so.

*Testing of DNA Evidence*

Mr. Johnson requested DNA testing of some evidence and retesting of other evidence both under Act 1780 of 2001, which is codified at Ark. Code Ann. § 16-112-201—207 (Supp. 2003), and under Rule 37, asserting trial counsel was ineffective for failing to request testing. The evidence at issue consists of the following: (1) a cigarette butt that was located in a green shirt that was blood-stained with the victim's blood and was found in the woods in close proximity to the victim's purse and a white t-shirt that also had the victim's blood on it; (2) negroid hairs found on the white t-shirt and in the victim's apartment on and around the victim's body; and (3) caucasian hairs that were found in the victim's apartment and on the green shirt in the woods. DNA test evidence was presented at both trials on the cigarette butt and negroid hairs, and Johnson was not able to be excluded as the donor of the DNA. According to Kermit Channell of the Arkansas Crime Laboratory, the chances the DNA belonged to another African American was 1 in 250.

Sometime after the first trial, further testing was performed on the saliva on the cigarette butt and it was shown that Johnson still was not excluded as the donor and the probability that another African American was the donor of the DNA was decreased from 1 in 250 to 1 in 28 million. In other words, retesting actually made it *more* likely that it was Johnson's DNA on the cigarette butt. The negroid hairs were not retested. The caucasian hairs have never been tested, and the prosecution stipulated that they did not belong to Johnson.

Along with his Rule 37 request for retesting, Mr. Johnson requests retesting of the above items under Act 1780 of 2001, which provides for retesting of evidence when there is new scientific technology available that was not available at trial. Act 1780 of 2001 is codified at Ark. Code Ann. §§ 16-112-201 through 207, and reads as follows:

(a)(1)   Except when direct appeal is available, a person convicted of a crime may make a motion for the performance of finger-printing, forensic deoxyribonucleic acid [DNA] testing, or other tests which may become available through advances in technology to demonstrate the person's actual innocence if:

(A)   The testing is to be performed on evidence secured in relation to the trial which resulted in the conviction; and

    (B)    The evidence was not subject to the testing because either the technology for the testing was not available at the time of the trial or the testing was not available as evidence at the time of the trial.

(2)    The motion shall be filed before the court in which the conviction was entered.

(3)    Reasonable notice of the motion shall be served on the prosecuting attorney who represented the state at trial.

(b)    A person who makes a motion for the performance of fingerprinting, forensic deoxyribonucleic acid testing, or other tests which may become available through advances in technology to demonstrate the person's actual innocence must present a prima facie case that:

(1)    Identity was an issue at trial; and

(2)    The evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect.

(c)(1)    The court shall order that testing be performed if:

(A)    A prima facie case has been established under subsection (b) of this section;

(B)    The testing has the scientific potential to produce new noncumulative evidence materially relevant to the defendant's assertion of actual innocence; and

(C)    The testing requested employs a scientific method generally accepted within the relevant scientific community.

(2)    The court shall impose reasonable conditions on the testing designed to protect the state's interests in the integrity of the evidence and the testing process.

Ark. Code Ann. § 16-112-202 (Supp. 2003).

Illinois was the first state to pass postconviction DNA testing laws, and Arkansas's Act 1780 was largely modeled after the Illinois laws. The Illinois model was used by at least three other states,

Delaware, Idaho, and Missouri, but most states follow a New York model which differs greatly in standards of review and is more akin to an ineffective assistance standard. Like Act 1780, Illinois's law requires:

(1) identity must have been an issue at trial;

(2) scientific evidence must not have been available at trial;

(3) testing must have potential to produce new, noncumulative evidence materially relevant to the assertion of actual innocence; and

(4) almost identical provisions for the preservation of evidence.

*See* 725 Ill. Comp. Stat. 5/116-3 (West 1998) (*cited in People v. Savory*, 756 N.E.2d 804 (Ill. 2001)).

In *People v. Savory, supra*, the Illinois Supreme Court considered a request for testing of evidence in a twenty-year-old conviction. At issue were bloodstains found on the defendant's trousers on the night of the murder. The Illinois Supreme Court held that the issue of whether or not evidence is "materially relevant" cannot be determined in the abstract, but must be considered along with other evidence introduced at trial. *Id.* In the *Savory* case, the trial court had found that Savory was not entitled to retesting unless he could show that results favorable to him would completely exonerate him. *Id.* The Illinois Supreme Court rejected this, and held that "material relevance" is not limited to those cases in which a favorable result would completely exonerate the defendant. Nonetheless, the court affirmed the trial court's denial of the retesting request, holding that the bloodstains on the trousers were not materially relevant because the prosecution's case rested primarily on other evidence and the bloodstains were essentially collateral. *Id.* In making this determination, the court went through the litany of other evidence and stated,

> ... [T]he bloodstain evidence was essentially a collateral issue at trial and was not central to the State's evidence of guilt. Under these circumstances, a test result favorable to the defendant *would not significantly advance his claim of actual innocence*, but would only exclude one relatively minor item from the evidence of guilt marshaled against him by the State.

*Id.* at 811-12 (emphasis added).

Like Arkansas, Delaware modeled its legislation on the Illinois Act. The Delaware Supreme Court, in a similar case, adopted the standards announced in *Savory, supra*, as follows:

> Because the Delaware statute was modeled after the Illinois statute, that state's case law is highly persuasive in determining the meaning of [the Delaware statute]. In *People v. Savory*, the Illinois Supreme Court overturned a lower court's determination that post-conviction DNA testing "is available only in cases where the proposed scientific testing will, by itself, completely vindicate a defendant." [FN 22] The Savory court decided the meaning of "materially relevant" by reference to dictionary definitions and held that, "evidence which is 'materially relevant' to a defendant's claim of actual innocence is simply evidence which tends to significantly advance that claim." [FN 23] We adopt that definition in construing the identical language in Delaware's statute.

> When deciding whether evidence is materially relevant, the trial court must consider not only the exculpatory potential of a favorable DNA test result, but also the other evidence presented at trial. [FN 24] Thus, if the State presented a strong case, and a favorable DNA test would discredit only an ancillary fact, the testing should be refused. At the opposite end of the spectrum, where the DNA test could exonerate the defendant, it does not matter how strong the other evidence might have been, [the Delaware statute] is satisfied.

*Anderson v. State*, 831 A.2d 858, 867 (Del. 2003). The Delaware court went on to hold that it is irrelevant whether the DNA test is likely to produce favorable or unfavorable results. If testing is warranted under this "material relevance" standard, the Delaware court held that testing would be authorized regardless of the slight chance it will yield a favorable result.

■ We do not believe, as the Delaware court does, that testing should be authorized regardless of the slight chance it may yield a favorable result. Nonetheless, we do find these cases to be persuasive, particularly with respect to their definition of the term "material relevance." Therefore, we hold that DNA testing of evidence is authorized if testing or retesting can provide materially relevant evidence that will significantly advance the defendant's claim of innocence, in light of all the evidence presented to the jury and the evidence presented to the trial court at the Act 1780 hearing.

Thus, in the instant case, we must look at the three pieces of evidence at issue in the petition for retesting, (1) the caucasian hairs, (2) the cigarette butt, and (3) the negroid hairs, in light of the other evidence introduced at trial, in order to determine whether the evidence is materially relevant and would require retesting. The other evidence included the following:

(1) a bloody green shirt, identified as belonging to Mr. Johnson,[2] was found in a wooded area in close proximity to the victim's purse, a bloody white t-shirt, and a bloody towel.

(2) DNA tests showed the victim could not be excluded as the source of the blood on the green shirt, the white t-shirt, and the towel.

(3) Officer Hayes McWhirter testified that the victim's young daughter, Ashley Heath, was present in the apartment the night of the murder and gave statements that

(A) a black male with a "girl sounding name" had come into the apartment;

(B) the black male had on a green shirt and sweater;

(C) the black male fought with her mother because her mother was dating someone else;

(D) she saw her mother and the black male fighting, then her mother was laying on the floor and was bloody.

(4) Ashley Heath had picked Mr. Johnson out of a photo lineup twice.

(5) At the time of his arrest, Mr. Johnson confessed to an Albuquerque police officer that he had killed someone in Arkansas;

(6) Testimony read into the record from Mr. Johnson's stepmother, Sharon Johnston, was that Mr. Johnson had been released from

---

[2] In the first trial, Johnson's stepmother, Sharon Johnston, identified the green shirt as belonging to Mr. Johnson. Ms. Johnston died before the second trial, so her first-trial testimony was read to the jury. We note that Mr. Johnson concedes in his brief that this identification of the green shirt as his "was a crucial item of evidence in tying the evidence to Johnson."

jail on another matter the day of the murder, and he had told her he was going to spend the night with a white female who worked at a bank and had two children (this description matched the victim).

(7) Testimony was heard from Steven Hill, an inmate who had been jailed with Stacey Johnson on the day of the murder, who stated that Johnson told him he was going to "have sex with the first woman he met" after being released from jail that day.

■ *The caucasian hairs.* In regard to the caucasian hairs that have never been tested, Johnson's request fails under Act 1780 for two reasons. First, subsection (a)(1)(B) requires that the evidence was not subject to testing before trial because the "technology for the testing" was not available at the time of trial or the "testing" was not available as evidence at the time of trial.[3] However, DNA testing of some sort *was* available at trial, and yet the caucasian hairs were not tested. The second reason the request fails as to the caucasian hairs is that this sort of DNA testing is used for the purpose of *excluding* a defendant as a possible donor. In this case, the prosecution stipulated that Johnson, an African–American, was not the donor of the caucasian hairs. Therefore, not only were the hairs available for at least some DNA testing, the jury knew there were hairs that belonged to someone other than Johnson and it still convicted him. On these facts, we do not believe that the caucasian hairs are evidence that is "materially relevant to the defendant's assertion of actual innocence" as required by § 16-112-202(c)(1)(B).

■ With regard to Mr. Johnson's Rule 37 claim that his counsel was ineffective for failing to request testing of the caucasian hairs, we find that claim is unfounded. Once the prosecution stipulated that these hairs belonged to someone other than Johnson, there was no need for the defense to request retesting. Mr. Johnson contends that the caucasian hairs should have been compared to the DNA database to determine if they matched the DNA of a known serial killer. However beneficial Mr. Johnson thinks such information might be, the fact is that this theory is so

---

[3] This second prong was written concerning tests such as DNA testing that were technologically available and performed at a time when states were still unsure of the reliability of DNA, so DNA testing might have been performed but might not have been admissible at the time of trial.

speculative that we cannot say a defense attorney was "deficient" for not having pursued it. Therefore, we affirm the trial court's decision to deny testing of the caucasian hairs on both the Act 1780 and Rule 37 petitions.

*The cigarette butt.* As to the saliva on the cigarette butt that was found on the green shirt, it was already retested once, pursuant to a request from Mr. Johnson. Far from excluding Mr. Johnson, the probability of the saliva being a donor other than Mr. Johnson went from 1 in 250 to 1 in 28 million, thereby decreasing the probability that the saliva belonged to anyone other than Mr. Johnson. Mr. Johnson argues that DNA testing has advanced now and there are new genetic markers that can now be tested. In support of his request, Mr. Johnson points to a statement by Kermit Channell of the Arkansas Crime Lab that "it is theoretically possible that someone could be excluded based upon a retesting for those additional markers." However, Mr. Channell also testified that the only way a retesting of the cigarette butt could exclude Mr. Johnson would be if he and someone else had the exact same DNA genetic profile — to a certainty of 1 in 28 million — and yet differed in other genetic markers. Mr. Channell testified that it was his opinion that it was extremely unlikely that retesting would rule out Mr. Johnson as the donor of the saliva on the cigarette butt.

The trial court denied Mr. Johnson's request to retest the cigarette butt, finding that the defense was seeking an endless succession of retesting of old evidence. We believe the trial court was correct. Act 1780 was not meant to do away with finality in judgments. It was meant to be used to test evidence that will prove *actual innocence* of a wrongly-convicted person. It is conceivable that one could test and retest evidence repeatedly, each time obtaining a more narrow result, while there still is a "theoretical possibility" that at some point a retest would exclude a defendant. Where would it end?

Act 1780 hearings are governed by Ark. Code Ann. § 16-112-205, which states in pertinent part:

> (d) The court may summarily deny a second or successive petition for similar relief on behalf of the same petitioner and may summarily deny a petition if the issues raised in it have previously been decided by the Arkansas Court of Appeals or the Arkansas Supreme Court in the same case.

Ark. Code Ann. § 16-112-205(d) (Supp. 2003). Mr. Johnson's request has the potential to open a case for retesting of evidence every time science advances to include testing for yet another genetic marker. However, this is simply not the purpose behind section 16-112-201 *et seq.*

■ Mr. Johnson obtained retesting once on the cigarette butt saliva, and it did not exclude him. In fact, it made it extremely likely that the saliva was his. Such a high probability that the saliva on the cigarette butt was Mr. Johnson's, coupled with Kermit Channell's testimony and all the additional evidence presented to the jury at trial, makes retesting results unlikely to "significantly advance" Mr. Johnson's "claim of innocence." On the Rule 37 claim of ineffectiveness, the defense attorneys were certainly not deficient for deciding to avoid retesting of the cigarette butt, in light of the results of their first retesting request. Therefore, we affirm the trial court's denial of retesting on the cigarette butt on both the Act 1780 and Rule 37 petitions.

*The negroid hairs.* The test results on the negroid hairs presented at trial are much more troubling. At trial, DNA results on these hairs could not exclude Mr. Johnson, but the probability that they belonged to another African-American were only 1 in 250. Considering the population of African-Americans in Arkansas alone, these results could conceivably include hundreds or thousands of people besides Mr. Johnson. Mr. Johnson acknowledges that retesting could result in the same narrowing of probability that happened when the cigarette butt was retested, but that the 1 in 250 ratio is so broad and includes so many persons other than Mr. Johnson, that he is entitled to retesting of the negroid hairs under Act 1780. We agree that retesting of the negroid hairs could be materially relevant to Mr. Johnson's claim of innocence. Certainly, the other evidence in this trial shows that a favorable result would not *per se* exonerate Mr. Johnson. Nonetheless, our interpretation of § 16-112-202 does not require such a showing of complete exoneration in order to request retesting alone. The fact that some of the negroid hairs were found on the victim's body made them particularly relevant to the prosecution's case, and test results that would exclude Mr. Johnson could significantly advance his claim of innocence.

██ For these reasons, we reverse the trial court's denial of Mr. Johnson's Act 1780 petition for retesting of the negroid hairs and remand for the trial court to have such tests conducted.[4]

While our holding effectively moots Mr. Johnson's Rule 37 request regarding the negroid hairs, we do wish to note that trial counsel testified that when the retest of the cigarette butt came back so unfavorably, it was a strategy decision to not retest the negroid hairs. That seems to have been a prudent decision, and strategic decisions are not within the ambit of a Rule 37.

### Other Rule 37 Claims of Ineffective Assistance of Counsel

In addition to his Rule 37 claim regarding DNA testing, Mr. Johnson makes thirteen other claims of ineffective assistance of counsel. None of these claims meet the two-pronged test set forth in *Strickland v. Washington, supra,* of both deficiency and prejudice.

### A. The Confession

Mr. Johnson contends his counsel was ineffective for failing to file a written motion to suppress his statement to an Albuquerque police officer that he had killed someone in Arkansas. In addition to this admission, Mr. Johnson also talked about some homicides in Arizona and drugs. Mr. Johnson claims (1) there was no tactical reason for failing to file a written motion to suppress, (2) counsel should have called Mr. Johnson to testify at the suppression hearing, and (3) counsel should have acted to exclude references to other offenses that Mr. Johnson made in his statement to police.

██ In the Rule 37 hearing, trial counsel testified that the suppression issue was litigated at a pretrial hearing despite the lack of a written motion to suppress. As to the issue of putting Mr. Johnson on the stand, defense counsel testified that the decision not to testify was made by Mr. Johnson after trial counsel explained the situation. Finally, counsel testified that he believed the statements would be admitted, so it was his strategy to make them appear that they were outrageous ramblings and were not credible.

---

[4] We note that while we are granting Mr. Johnson's request for retesting under § 16-112-202, it would be premature for us to address the circuit court's refusal to grant a new trial under § 16-112-201, because that statute does not contemplate consideration of a petition for new trial until new scientific evidence has been obtained.

Matters of trial strategy are not grounds for postconviction relief. *Noel v. State, supra; Lee v. State, supra.*

### B. Competency of Ashley Heath

In order to impeach Ashley Heath, Mr. Johnson's counsel wanted access to records of Ashley's treatment by a therapist. The defense believed these treatment records would show that Ashley did not have a memory of the night of her mother's murder but had instead been coached into identifying Mr. Johnson. These records were kept sealed because of Ashley's privilege as a patient. Mr. Johnson contends his counsel was ineffective for (1) failing to present evidence that those records fell outside privilege because they were for the purpose of preparing for litigation, (2) failing to present additional impeachment evidence, including cross-examining Ashley about her memories, and (3) failing to offer an expert treatise in support of his request for appointment of an expert to examine the child for competency.

Though Mr. Johnson mentions all three of these subpoints in his brief, he admits that testimony at the hearing did not support his first claim that counseling was for the purpose of litigation, so that defeats his first subpoint, and he makes no other argument for his second subpoint. Therefore, he has abandoned the first two subpoints and his only argument on this point concerns the treatise that he believes counsel should have introduced.

Mr. Johnson asserts that the circuit court erred in its rulings on the issue, and then simply asserts without citation to authority or supporting argument that there is a reasonable probability that the motion for an expert would have been granted if the treatise had been proffered and that the expert would have concluded that Ashley was incompetent to testify. We have repeatedly held that we will not consider an argument on appeal that has no citation to authority or convincing legal argument. *See Smith v. State*, 354 Ark. 226, 118 S.W.3d 542 (2003); *Kelly v. State*, 350 Ark. 238, 85 S.W.3d 893 (2002). Because Mr. Johnson's argument is conclusory and cites no authority and makes no convincing legal argument in support of his contention, he has failed to show that the circuit court clearly erred in denying relief on this point.

### C. Sixth Amendment Right to Confront Ashley Heath

In *Johnson I*, we held that some of Ashley Heath's statements to officers constituted excited utterances and did not violate the

Sixth Amendment's Confrontation Clause. 326 Ark. at 438-45. At retrial, trial counsel made hearsay objections to these statements. In *Johnson II*, we rejected any appeal on the issue on law of the case grounds and because it was not supported by argument or authority. 342 Ark. at 202-03.

Mr. Johnson contended in his petition that this court wrongly ruled on the issue in *Johnson II*, and that counsel was ineffective in failing to preserve the issue for review. The circuit court refused to consider appellant's claim, ruling that it was an attempt to reargue an issue settled on direct appeal. On appeal, appellant again argues that the confrontation issues were preserved for review, and, if not, counsel was ineffective in failing to preserve the issue.

However, these arguments regarding preservation are irrelevant. We did not rule in *Johnson II* that the issue was not preserved for review — we rejected any appeal on the issue because it was not supported by argument or authority, and, alternatively, because we had decided the issue in *Johnson I*. As such, Mr. Johnson's argument that counsel was ineffective in failing to preserve the issue is without merit on its face.

In addition to the preservation argument presented in the Rule 37 hearing, Mr. Johnson has now raised a new argument on appeal: that counsel was ineffective in failing to sufficiently argue the issue in the *Johnson II* appeal. This argument was not raised below and was not ruled on by the circuit court; therefore, we do not consider it. *See Nooner v. State*, 339 Ark. 253, 4 S.W.3d 497 (1999). Even if a Confrontation Clause challenge constitutes an exception for some issues not raised below and preserved on appeal where the error is so fundamental as to render the judgment of conviction void and subject to collateral attack, *see State v. Montague*, 341 Ark. 144, 147 (2000), this court already decided the issue in *Johnson I* and rejected reconsideration in *Johnson II*. Thus, as the circuit court ruled, Mr. Johnson cannot reargue in his Rule 37 petition issues settled below. Furthermore, he suffered no *Strickland* prejudice because the outcome of his appeal would have been the same. *See Sanford v. State*, 342 Ark. 222, 28-29 (2000) (failing to raise objection without merit does not equate to ineffective assistance).

For these reasons, the trial court is affirmed on this issue.

## D. Failure to Couch Proffer of Cordelia Ramsey Vinyard's Testimony in Constitutional Terms

Mr. Johnson contends that trial counsel was ineffective "in failing to couch the proffer of the testimony of Cordelia Ramsey Vinyard in federal and state constitutional terms of the right to present a defense under due process, fair trial, compulsory process and confrontation." The result of the testimony, argues Mr. Johnson, is that it would have helped show that someone else committed the murder, because Branson Ramsey, Ms. Vinyard's ex-husband, was a friend of Carol Heath. Ms. Vinyard's proffered evidence concerned alleged violence committed against Ms. Vinyard by Branson Ramsey when they were married.

The circuit court ruled that counsel did proffer the testimony, and that no evidence was presented at the Rule 37 hearing to find that we did not settle the issue in *Johnson II. See* 342 Ark. 186, 201-02 (holding that the trial court did not abuse its discretion in refusing to admit Ms. Vinyard's testimony). Mr. Johnson's argument is conclusory in its assertion that the testimony would have been admitted had counsel couched the proffer in constitutional terms. Moreover, Mr. Johnson's Rule 37 claim on appeal is that the proffer should have been argued in constitutional terms, "which would permit a federal habeas court to review it." Failure to preserve an issue for federal habeas review is not the prejudice contemplated by the *Strickland* test, which requires a reasonable probability that the outcome at trial or, in this case, on appeal, would have been different. No such prejudice is cited by Mr. Johnson in this appeal. Therefore, the circuit court's ruling is affirmed on this point.

## E. Failure to Impeach Stepmother's Testimony

In the first trial, Mr. Johnson's stepmother, Sharon Johnston, identified the bloody green shirt found in the woods as belonging to Mr. Johnson. Ms. Johnston died before the second trial commenced, and her testimony from the first trial was read into the record to the jury. Mr. Johnson argues that his counsel was ineffective in failing to impeach his stepmother's testimony on account of bias. Mr. Johnson contends his stepmother was biased toward him because she was angry that he had taken her automobile, and that his aunt, Debra Johnson, could have been called to testify about this.

At the Rule 37 hearing, Mr. Johnson argued that the evidence would have been admissible under Ark. R. Evid. 806, and under the rule that evidence of bias is always admissible. *See, e.g., Dansby v. State*, 319 Ark. 506, 893 S.W.2d 331 (1995). The trial court declined to find ineffective assistance of counsel because Rule 806 had to be read in conjunction with Rule 801(d)(2). However, Rule 806 refers to "a hearsay statement, *or* a statement defined in Rule 801(d)(2)(iii), (iv), or (v)." Mr. Johnson's argument is well-taken as regards the circuit court's interpretation of Rule 806. Clearly, Rule 806 is not required to be read in conjunction with Rule 801(d)(2).

Nonetheless, Mr. Johnson's argument fails for another reason. While trial counsel David Clark testified at the Rule 37 hearing that he could have presented testimony from Debra Johnson that Mr. Johnson's stepmother was angry at him, Mr. Johnson failed to present the testimony of Debra Johnson herself, or any other evidence of the stepmother's anger and alleged bias. The statement of attorney Clark that he was told by Debra Johnson that Sharon Johnston was angry was rank hearsay. Moreover, Mr. Clark testified that, although he recalled the aunt, Debra Johnson, being aware of the stepmother's anger, he could have been wrong.

There is no indication that Debra Johnson was unavailable to testify at the Rule 37 hearing about Sharon Johnston's supposed bias, but she did not testify and no affidavit in support of Mr. Johnson's contentions was provided by her to the circuit court. The circuit court was not provided any real evidence at the Rule 37 hearing that the stepmother was, in fact; angry or biased. Before Mr. Johnson can show trial counsel was deficient for failing to impeach the stepmother for bias, he must first present evidence that there was bias. He did not do so. Furthermore, Mr. Johnson alleges no prejudice as required by *Strickland*, but merely states that it is ineffective assistance of counsel to fail to impeach with available evidence. Mr. Johnson's argument fails, and the trial court is affirmed on this point.

### F. Failure to Establish that Johnson had Given Truthful Information

Mr. Johnson claims it was ineffective assistance for his trial counsel to fail to establish that, upon being bonded out of jail shortly before the murder, he gave truthful information as to his address and other identification. He contends this would have shown the jury that he was not hiding from anyone. However, trial

attorney Mickey Buchanan testified he decided not to use this information because it would have emphasized to the jury that Johnson had been in jail — a fact that they already knew, but that he did not wish to emphasize. This was a trial strategy and was not ineffective assistance of counsel. *See Noel v. State, supra; Lee v. State, supra.*

### G. Failure to Impeach Jailhouse Witness Steven Hill

Steven Hill and Mr. Johnson were housed in the same jail on the morning of the murder. In his testimony, Hill was unable to identify Mr. Johnson in the courtroom, but testified that he was in jail with Stacey Johnson, a larger person, and that Johnson stated, "that when he got out of jail he was going to have sex with the first woman he ran into." Mr. Johnson contends trial counsel were ineffective for failing to impeach Hill with prior statements indicating that he was pressured to make the claim against Johnson.

Trial counsel Buchanan eventually stipulated to the statement and asked no questions. Trial counsel Clark testified at the Rule 37 hearing that a defense investigator had evidence that Hill admitted to being pressured into giving his testimony. In his ruling on the Rule 37 petition, the circuit court ruled that Hill was sufficiently impeached on the stand when he failed to identify the appellant in the courtroom, and he credited Buchanan's explanation that eliciting further testimony could have been damaging.

Mr. Johnson's argument on appeal is conclusory — that the reliance on the non-identification as a reason not to impeach Hill is disingenuous and unreasonable. However, Buchanan gave a reasonable explanation — that he was concerned if he pressed Hill, further testimony would be damaging.

Furthermore, Mr. Johnson provides a colloquy that occurred during the Rule 37 hearing between Mr. Johnson's counsel and trial attorney Clark, in which Clark stated an investigator told Clark that he had a tape recording of an interview with Hill. In this recording, according to Clark, Hill allegedly told the investigator he had been pressured into giving his statement against Mr. Johnson. Again, this was hearsay within hearsay. Mr. Johnson did not produce the tape, an affidavit from the investigator or the investigator himself, or an affidavit from Hill or Hill himself, to testify as to the veracity of these statements allegedly made by Hill. Furthermore, Clark did not testify that he heard the tape himself.

Without any actual evidence before the circuit court that Hill had been pressured into giving testimony, it was not error

for the circuit court to conclude there was no evidence of ineffective assistance of counsel in regard to impeachment of Hill's testimony.

### H. Failure to Develop Evidence of Relationship Between the Victim and Doyle Green

Mr. Johnson next claims counsel was ineffective in failing to fully proffer testimony and other evidence of a relationship between the victim and Doyle Green, an African-American. Mr. Johnson claims such evidence would have contradicted the State's claim that the victim had no relationships with black men. *See Johnson I*, 326 Ark. at 447. Mr. Johnson also claimed that a DNA analysis would have combated the State's evidence if the negroid hairs positively matched Green or failed to exclude him.

Trial counsel Buchanan testified that the matter was considered and rejected as a viable defense, and he made a strategic decision not to call Green. Again, trial tactics are not fodder for a Rule 37 petition. *Noel v. State, supra; Lee v. State, supra.* Furthermore, it was not within the ambit of defense counsel's authority to force a DNA sample from Green, and we can find nothing in the record to indicate that the State had obtained Green's DNA for comparison. Therefore, to contend that the defense was deficient because there was no DNA evidence to impeach the State's evidence is unfounded. The circuit court is affirmed on this point as well.

### I. Failure to Obtain Access to Victim's Counseling Records

Mr. Johnson argued in his first supplemental Rule 37 petition that counsel was ineffective in failing to obtain the victim's counseling and psychological records or to call her counselor as a witness. He contended that such would have resulted in discovery of any persons the victim was afraid of or who had threatened her. Any such person could then have been an alternate suspect against whom one could test forensic evidence. In the alternative, Mr. Johnson argued that counsel should have preserved the issue for appellate review. The circuit court denied relief, concluding that Mr. Johnson's argument was speculative, that counsel did not see fit to pursue such theoretical evidence, and that the consideration of new evidence was beyond the scope of Rule 37.

On appeal, Mr. Johnson notes that the circuit court seemed to treat this claim as a freestanding one. Mr. Johnson has abandoned his ineffectiveness claim on appeal, because the two brief

paragraphs devoted in his brief to this issue are merely a recitation of his arguments below, followed by an assertion that the trial court erred in denying Mr. Johnson access to the records and refusing to make an *in camera* inspection of the records requested. Johnson submits that the circuit court should have examined the records *in camera* to determine if any alternative suspects are contained therein, and cites *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), in support of his argument. However, we rejected such a freestanding claim in *Weaver v. State*, 339 Ark. 97 (1999):

> As to Weaver's claim bearing on the trial court's refusal to direct the State to provide exculpatory evidence comprised of a list of persons undercover agent Tucker had arrested and prosecuted, he simply is in no position to raise this matter in a Rule 37 proceeding. Weaver sought these persons' names and addresses in a belated attempt to substantiate his theory that Tucker engaged in sexual relations with Weaver and other men in an attempt to induce them to commit crimes involving illegal drugs. For authority, Weaver relies on *Brady v. Maryland*, 373 U.S. 83 (1963), which requires the State to disclose all favorable evidence material to the guilt or punishment of an individual.

> The list of persons, if any, now sought by Weaver, was available at his original trial, but he never sought the information, nor did he claim a right to such information on direct appeal. Weaver does not use this postconviction proceeding to claim his counsel at trial and on appeal were ineffective for failing to obtain the list of names, but instead, he seeks to obtain that information in this postconviction proceeding, saying he is entitled to it as exculpatory evidence. Rule 37 does not provide for such discovery, and Weaver fails to cite any authority for the proposition. Neither does the Rule provide a remedy when an issue could have been raised in the trial or argued on appeal. *Malone v. State*, 294 Ark. 127 (1987). Our court has specifically held in *Neal v. State*, 270 Ark. 442, 605 S.W.2d 421 (1980), that Rule 37 does not allow a petitioner to raise questions which might have been raised at trial or on the record on appeal, unless they are so fundamental as to render the judgment void and open to collateral attack. If Weaver wanted to challenge the propriety of discovery, he should have done so before now by preserving the issue during his trial and raising it on direct appeal.

*Weaver v. State*, 339 Ark. 97, 103 (1999).

▮ Thus, Mr. Johnson cannot raise this issue now as a direct attack on his conviction via Rule 37. Although Mr.

Johnson, unlike Mr. Weaver, did allege ineffective assistance for counsel's failure to obtain the records, he has abandoned that argument on appeal. The circuit court is thus affirmed on this point.

### J. Failure to Object Properly to Alleged Brady Violations

In the Rule 37 hearing, Mr. Johnson alleged ineffectiveness for failing to object properly pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), for timely production of all exculpatory and mitigating evidence, including making motions for continuance. Mr. Johnson argued that a motion for continuance would have been successful or grounds for a successful appeal. He identified four items of evidence: (1) a video of the Heath residence showing the crime scene, (2) a failure to reveal contacts between the Heath family and police, in particular alleged relationships between the police and an alternative suspect, (3) untimely production of shoe prints and hair that allegedly could have shown persons other than appellant were present, and (4) a failure to provide medical examiner's photographs that allegedly would have demonstrated further confusion in the physical evidence.

The circuit court made an extensive ruling on this claim; however, on appeal Mr. Johnson has only pursued the claim with respect to the video of the crime scene. As to that piece of evidence, the circuit court ruled that Mr. Johnson presented no evidence concerning the harmful denial of a motion for continuance, that such matter should have been raised on direct appeal, and, further, that Mr. Johnson presented no evidence supporting his allegation that the video tape would have shown tainted evidence. Moreover, the circuit court credited the testimony of counsel that he was not interested in the videotape because he preferred still photographs.

Once again, Mr. Johnson's argument is conclusory. He disagrees with the circuit court's credibility determination, to which this court defers. *Jones v. State*, 344 Ark. 682, 42 S.W.3d 536 (2001). Mr. Johnson further admits that he is unable to demonstrate prejudice because no video has been found to exist. Only references to a video in some trial documents exist, and the prosecuting attorney stated that he had seen no video and did not know where it was. Mr. Johnson admits that if such a video exists, it might have been an appropriate tactical decision not to use it. As stated previously, a tactical decision is not grounds for an

ineffective-assistance claim, and without any claim of prejudice, neither prong of *Strickland* is met by this point on appeal. The trial court is affirmed on this point as well.

### K. Ineffective Assistance in Jury Selection

This point on appeal contains no argument whatsoever. Mr. Johnson merely states that he argued below that trial counsel "also were ineffective in their failure to properly preserve the motion for change of venue from Pike County to Little River County because of the paucity of African-American residents in Pike and the larger number in Little River." We do not consider arguments that have no citation to authority or legal argument in support thereof. *Kelly v. State, supra.*

### L. Failure to Object to Evidence of Victim's Religious Activities

Mr. Johnson claimed that counsel was ineffective during the penalty phase for failing to object to evidence concerning the victim's religious activities under Ark. R. Evid. 401 to 403 and 610, and outside the scope permitted by *Payne v. Tennessee*, 501 U.S. 808 (1991). The circuit court denied relief, concluding that this court settled the issue in *Johnson II*, and that counsel did make proper objection at trial and that the evidence was admissible.

We did rule in *Johnson II* that counsel failed to preserve for appeal any argument on this issue. 342 Ark. at 199. Once again, however, appellant's argument is conclusory in that he fails to explain why the evidence would have been excluded if counsel's objections had been more detailed, and fails to explain why the evidence falls outside the scope of *Payne*. In short, his argument falls short of showing either deficient performance or prejudice. Therefore, the trial court did not clearly err in denying Rule 37 relief on this point.

### M. Failure to Argue that the Victim Impact Law is Unconstitutional

Mr. Johnson renews his assertion that the Arkansas Victim Impact Statute, codified at Ark. Code Ann. § 5-4-602, is unconstitutional, and that counsel were ineffective in failing to make this claim. That is his entire argument. He alleges no reasons why counsel was ineffective in failing to make this claim, nor does he allege any prejudice. Therefore, he has met neither prong of the *Strickland* test and the trial court is affirmed on this point.

### III. Allegation of Error in Denial of the Motion to Supplement the Rule 37 Petition

Two days before the circuit court issued its orders denying relief, Mr. Johnson moved for a second time to supplement his petition after the U.S. Supreme Court handed down *Ring v. Arizona*, 536 U.S. 584 (2002). *Ring* held that the principles in *Jones v. U.S.*, 526 U.S. 227 (1999), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), specifically apply to capital cases, and the Supreme Court overruled precedent in contravention. *See id.* The summarized holding states,

> Accordingly, Walton is overruled to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. Because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," *Apprendi*, 530 U.S. at 494, n. 19, the Sixth Amendment requires that they be found by a jury.

*Id.* at 585.

Mr. Johnson argued in his proposed supplemental petition that Arkansas's victim-impact procedure violated the doctrines announced in *Jones, Apprendi*, and *Ring*. He contended that victim-impact evidence is not charged in the information, and is not proven to the jury beyond a reasonable doubt because statutory law provides no standard of proof or place on the verdict form for the jury to indicate its findings as it does with aggravating circumstances. Mr. Johnson submits that such constitutes a fundamental denial of the right to a jury trial and is cognizable for the first time in a Rule 37 proceeding.

A circuit court's denial of leave to amend a petition is reviewed by an abuse-of-discretion standard. *Sanders v. State*, 352 Ark. 16, 98 S.W.3d 35 (2003). It should be noted as well that this court has repeatedly stated that, in death cases where a Rule 37 petition is denied on procedural grounds, great care should be exercised to assure the denial rests on solid footing. *Id.* (citing *Echols v. State*, 344 Ark. 513, 42 S.W.3d 467 (2001); *Wooten v. State*, 338 Ark. 691, 1 S.W.3d 8 (1999)).

In *Sanders v. State, supra*, we held it was an abuse of discretion for a trial court to summarily dismiss a Rule 37 petition because the certificate of service caused the petition to exceed the page limit by

one page. On the other hand, in *Weaver v. State*, 339 Ark. 97, 3 S.W.3d 323 (1999), we upheld a denial of leave to insert a last-minute due-process claim into a Rule 37 petition because the State was unprepared and unable to respond to the new theory without obtaining a continuance.

In the case at bar, similar to *Weaver*, Mr. Johnson submitted his motion two days before the circuit court issued its orders denying relief. Mr. Johnson submits that his claim fits the *Rowbottom* exception and can be raised for the first time in a Rule 37 proceeding. *See Rowbottom v. State*, 341 Ark. 33, 13 S.W.3d 904 (2000) (holding that errors, including constitutional errors, that are so fundamental as to render the judgment of conviction void and subject to collateral attack may be raised for the first time in a Rule 37 petition). We concluded in *Rowbottom* that the right to a twelve-member jury was a fundamental right, the violation of which rendered the judgment void and subject to collateral attack. *Id.*

Clearly, the right to a jury trial is a fundamental right, and this court has recognized *Apprendi* and the fundamental right to be judged by a standard of proof beyond a reasonable doubt in a criminal trial. *See Anderson v. State*, 353 Ark. 384, 108 S.W.3d 592 (2003). Therefore, it could be concluded that Mr. Johnson has made a claim stronger than that made in *Sanders v. State, supra*. If that is the case, in this instance of a claim of the denial of a fundamental right, then the circuit court erred in denying leave to supplement Mr. Johnson's petition.

The question then becomes whether, if the circuit court abused its discretion, the case should be remanded for consideration and the issuance of findings, or whether we should simply decide the issue on appeal, perhaps under one of the *Wicks* exceptions. *See Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980). Neither side has mentioned *Wicks*; however, Mr. Johnson has framed his argument in such a way that it could possibly fall under the first *Wicks* exception; that is, when the trial court fails to bring to the jury's attention a matter essential to its consideration of the death penalty itself. *See, e.g., Anderson v. State, supra*. Thus, the issue of a possible *Wicks* exception is presented to us in this appeal, particularly when we consider that the State's brief on appeal addresses only the underlying merits of Mr. Johnson's claim, foregoing any defense of the circuit court's refusal to grant leave to supplement the petition.

If we treat this as a *Wicks* exception, we must then decide whether, because this is a Rule 37.5 case, remand for consideration by the circuit court is more appropriate than this court considering the claim on our own motion under *Wicks*. After all, Rule 37.5 places an affirmative duty on the circuit court to issue findings of facts and conclusions of law on each claim raised. *See Echols v. State*, No. CR99-1060, slip op. (Oct. 30, 2003). Furthermore, the State had no opportunity below to respond to Mr. Johnson's second motion to supplement and both parties' arguments on appeal fail to provide a detailed discussion of the precedent related to this issue. Under these circumstances, we would normally be inclined to remand to the circuit court for findings.

Regardless of these conflicting considerations, however, we believe remand is not prudent in this case because Mr. Johnson could not prevail on his claim regarding victim-impact evidence in any case. The challenged statute is Ark. Code Ann. § 5-4-602(4) (Repl. 1997), and it requires a jury to consider victim-impact evidence in the context of weighing aggravating and mitigating circumstances. *McGehee v. State*, 348 Ark. 395, 72 S.W.3d 867 (2002).

> Speaking generally, in *Nooner v. State*, 322 Ark. 87, 907 S.W.2d 677 (1995), we upheld the underlying constitutionality of victim-impact testimony. *See Nooner*, 322 Ark. at 107-109, 907 S.W.2d at 688-89 (citing *Payne v. Tennessee, supra*). This decision has been reaffirmed since. *See Fudge v. State*, 341 Ark. 759, 20 S.W.3d 315 (2000); *Engram v. State*, 341 Ark. 196, 15 S.W.3d 678 (2000).

*McGehee v. State*, 348 Ark. at 415, 72 S.W.3d at 879.

Furthermore, we stated in *Noel v. State*, 331 Ark. 79, 960 S.W.2d 439 (1998), that our case law specifically rejected the notion that victim-impact evidence is an aggravating circumstance or that it violates the statutory weighing process set out in Ark. Code Ann. § 5-4-603 through 605 (Repl. 1993). *See Kemp v. State*, 324 Ark. 178, 204, 919 S.W.2d 943, 956 (1999), *cert. denied*, 519 U.S. 982 (1996) (expressly addressing the issue of whether "because there is no place in the Arkansas statutory weighing process for the jury to consider victim-impact evidence, our victim-impact statute is violative of the Eighth and Fourteenth Amendments to the United States Constitution and Ark. Const. art. 2, § 9").

Therefore, as the State argues in its brief, *Ring, Apprendi*, and *Jones* are inapplicable to victim-impact evidence because it is not an element contained in a statute — it is simply evidence to be considered. Under our statutory procedure, aggravating circumstances must be proven beyond a reasonable doubt, and, thus, our procedure meets the standards of *Ring* and *Apprendi*. Accordingly, because the argument would thus be without merit even had the circuit court granted leave to supplement, we affirm the circuit court's refusal to grant leave to supplement the Rule 37 petition. *See Jackson v. State*, 352 Ark. 359, 105 S.W.3d 352 (2003) (rejecting challenge to victim-impact laws' constitutionality when framed as ineffective assistance of counsel).

### IV. Constitutionality of the Death Penalty

Finally, Mr. Johnson claimed that his death sentence was obtained unconstitutionally in violation of the prohibitions against *ex post facto* laws. This court rejected Mr. Johnson's arguments on this point in both *Johnson I, supra*, and *Johnson II, supra*. Other than stating in his brief that he "reargues" this point, Mr. Johnson provides no argument whatsoever on this point on appeal. Because he provides no argument and we have already considered this claim twice, in *Johnson I* and, again, in *Johnson II*, we hold that this claim is without merit.

In conclusion, we reverse the circuit court's denial of Mr. Johnson's Act 1780 petition to retest the negroid hairs introduced into evidence at his trial, and remand for the circuit court to order DNA retesting of the negroid hairs to determine if Mr. Johnson can be excluded as the source of those hairs. We affirm the circuit court's denial of relief based on the remainder of Mr. Johnson's Act 1780 petition claims, as well as all other claims on appeal.

Affirmed in part, reversed and remanded in part.

BARBARA WEBB, Spl. J., joins in this opinion.

CORBIN, J., not participating.